MICAHEL J. HEYMAN
United States Attorney

SETH M. BEAUSANG
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-1523
Email: seth.beausang@usdoj.gov

DOMINICK D. GIOVANNIELLO
Trial Attorney
Criminal Division, Tax Section
Department of Justice
1331 F St NW
Washington, D.C. 20004
Email: dominick.d.giovanniello@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>CLARIBEL TAN,<br><br>Defendant. | 3:24-cr-00072-001-SLG |

**SENTENCING MEMORANDUM**

The United States recommends imposition of the following sentence:

**INCARCERATION**..................................................................................**78 MONTHS**
**SUPERVISED RELEASE**..........................................................................**2 YEARS**
**SPECIAL ASSESSMENT**................................................................................**$200**
**RESTITUTION (MANDATORY)**............................................. **at least $16,771,260**

**FORFEITURE**.................................................... **assets listed in the plea agreement**
**FINE**........................................................................................**$0**

## I.    INTRODUCTION

For more than a decade, Claribel Tan and her husband, Daniel Tan, perpetrated a $12 million fraud scheme to bill health insurance programs for medications and services they did not purchase or provide. The Tans fraudulently enriched themselves at the expense of their patients – who they deceived, underdosed, and injected with expired and/or improper medications. The Defendants seriously risked the health of their patients for no apparent reason other than greed and should be punished accordingly.

Claribel Tan was an Anchorage rheumatologist who specialized in the diagnosis and treatment of autoimmune and musculoskeletal diseases, such as rheumatoid arthritis ("RA") and psoriatic arthritis ("PSA"). These conditions are often chronic, degenerative, and irreversible. The medications Claribel Tan told her patients she was injecting into them can slow or arrest the diseases' progression but cannot reverse the damage they cause.

However, the Tans lied to their patients about the medicines they were receiving. The Tans did not buy the medicines, or sufficient quantities of the medicines, to account for the claims they submitted to healthcare benefit programs. Covert video recordings confirmed the Tans lied to patients as to the identity and quantity of the substances Claribel Tan injected into them. Claribel Tan also falsified her patients' medical records to help cover up her fraud. She thereby violated her patients' trust, endangered their health, and deprived them of the ability to properly manage their conditions and prevent irreversible

damage to their bodies. Daniel Tan intentionally failed to purchase medications, submitted fraudulent claims, and was essential in helping to carry out the scheme.

Incredibly, the Defendants continued to execute their scheme even after they learned of the government's investigation. On July 9, 2019, the government executed a search warrant on the Defendants' clinic, causing them to temporarily begin purchasing more medications. By 2021, however, the Defendants resumed their scheme. All told, between 20010 and 2024, the Defendants billed healthcare benefit programs for 4,829 units of relevant medications (the "Subject Medications") concerning approximately 334 injection patients,[1] despite only purchasing 369 units.[2] The Defendants obtained more than $12 million in healthcare fraud proceeds. To retain their fraud proceeds and conceal their scheme, the Defendants also filed false tax returns, resulting in a tax loss to the government of more than $4 million.

The scope and duration of the Defendant's scheme, the callous disregard she showed for the safety and health of patients, and her decision to continue the scheme after learning of the government's criminal investigation, in addition to the other § 3553(a) factors, all require that Claribel Tan serve a sentence of 78-months incarceration, to be followed by 2 years of supervised release, and pay $16,771,260 of restitution. Such a sentence is necessary to reflect the immense harm Claribel Tan caused, provide just punishment for

---

[1] The government has obtained claims data for approximately 646 patients; however, the Tans only claimed injection services for 334 of those patients between 2010 and 2024.
[2] The PSR at ¶ 9 includes a chart showing units purchased and claimed prior to the search warrant, and acknowledges that the Defendants continued their fraud scheme after the execution of the search warrant.

her crimes, and deter others from engaging in similar conduct. The government's proposed two-point variance accounts for any mitigating § 3553(a) factors.

## II.    GUIDELINES CALCULATION

The parties and U.S. Probation agree on the applicable enhancements and the total offense level of 30.

### Count 1

| | |
|---|---|
| Base Offense Level, U.S.S.G. §§ 2B1.1(a)(2) and 2B1.1(b)(1)(K) (Fraud loss >$9.5 million) | 26 |
| 10+ victims, U.S.S.G. § 2B1.1(b)(2)(A)(i) | +2 |
| >$1 million loss to government healthcare program, U.S.S.G. §2B1.1(B)(7)(i): | +2 |
| Conscious or reckless risk of death or serious bodily injury, U.S.S.G. § 2B1.1(b)(16)(A) | +2 |
| Abuse of position of trust, U.S.S.G. § 3B1.3 | +2 |
| Adjusted offense level | 34 |

### Count 2

| | |
|---|---|
| Base Offense Level, U.S.S.G. §§ 2T1.1(a)(1)(J) (Tax loss >$3.5 million) | 24 |
| >$10,000 of illegal source income, U.S.S.G. § §2T1.1(b)(1) | +2 |
| Adjusted offense level | 26 |

### Combined Offense Level

| | |
|---|---|
| Greater of the adjusted offense levels | 34 |
| 1.5 units, U.S.S.G. § 3D1.4 | +1 |
| Zero-point offender, U.S.S.G. § 4C1.1 | -2 |

Acceptance of responsibility, U.S.S.G. §§ 3E.1(a), (b)    -3

**Total offense level**    **30**

The government agreed in the plea agreement to recommend a downward variance under 18 U.S.C. § 3553(a) equivalent to a two-level offense level departure, resulting in a total offense level of 28 and a sentencing range of 78-97 months. [Dkt. 75 at 20] The Government further agreed to request a sentence at the low-end of the applicable United States Sentencing Guideline range as calculated by the parties.

## III.    FACTUAL SUMMARY[3]

Claribel Tan is 61 years old. She is highly educated, having completed medical residency training and a fellowship in rheumatology. In 2005, she opened her rheumatology practice, Claribel K. Tan, M.D., LLC, which she operated with Daniel Tan, until her indictment and summary medical license suspension in summer 2024. As the clinic's sole physician, Claribel was responsible for diagnosing and treating patients, while Daniel Tan performed office and management work, including ordering medication and preparing insurance claims. From 2014 through at least May 2024, the Tans employed a nurse, B.B., who primarily administered in-office medication infusions to patients.[4]

Daniel Tan is 70 years old. He is highly educated, having earned a master's degree. Daniel Tan worked at the front desk at the clinic performing managerial and administrative

---

[3] Because of the Defendants acted together to commit their crimes, the Factual Summary for the Sentencing Memorandums for both defendants is identical. The government is including the summary in both memos for completeness of the record.

[4] The infusions performed by B.B. are different than the injections that Claribel Tan performed and for which the Defendants fraudulently billed.

tasks. He often interacted with patients when they arrived for appointments. He completed superbills to support the reimbursement claims the clinic sent to health care benefit programs. Daniel Tan was also responsible for purchasing medicines for the clinic.

Beginning not later than 2009, and continuing through 2024, Claribel and Daniel Tan perpetrated a massive fraud through two primary means: (1) a medication injection scheme, whereby the Tans billed for injection services and medications they did not purchase and/or provide, and (2) a prolonged services scheme, in which they billed for extended face-to-face examinations that never occurred.

### A. The Medication Injection Scheme

Between 2010 and 2024, the Defendants billed health insurers for 4,829 units of the Subject Medicines despite only purchasing 369. In other words, they purchased less than 8% of the injection medications for which they billed insurance and claimed to inject patients. The Subject Medicines were cutting-edge biologic medicines intended primarily to treat RA and PSA. The Subject Medicines were available for self-injection by patients, which is preferred to in-office injection because it is cheaper, does not require a co-pay for a clinic visit, and obviates the need for patients to take time off to go to the doctor. In-office injections are usually reserved for teaching patients how to self-inject, monitoring, or for patients who have difficulty self-injecting. When a patient opts for in-office injections, the injections are typically performed by nurses, not physicians, since the billing rates are significantly higher for physicians.

The Subject Medicines required regular injections, loading periods, and dosages to be effective. These medications also tended to be especially expensive. For example, the

Tans received an average of approximately $12,121 per dose of Stelara they billed to the insurance. The government determined the total fraud proceeds by dividing the total units the Defendants purchased by the total units they claimed, and then multiplying it by the Defendants' total reimbursements for each medication, as outlined in the following table:

| Drug/Service Name | Units Purchased | Units Claimed | Difference | Total Reimbursements | Fraud Ratio | Fraud Proceeds |
|---|---|---|---|---|---|---|
| Cimzia | 205 | 1,945 | 1,740 | $7,540,542.53 | 89.5% | $6,745,780.98 |
| Stelara | 0 | 130 | 130 | $1,445,260.15 | 100.0% | $1,445,260.15 |
| Humira | 0 | 1,013 | 1,013 | $531,554.03 | 100.0% | $531,554.03 |
| Prolia | 9 | 178 | 169 | $244,879.55 | 94.9% | $232,498.00 |
| Enbrel | 8 | 250 | 242 | $77,652.42 | 96.8% | $75,167.54 |
| Kenalog | 64 | 1,020 | 956 | $12,549.91 | 93.7% | $11,762.46 |
| Cosentyx | 0 | 14 | 14 | $82,326.26 | 100.0% | $82,326.26 |
| Simponi | 1 | 9 | 8 | $40,029.64 | 88.9% | $35,581.90 |
| Synvisc | 4 | 113 | 109 | $57,185.82 | 96.5% | $55,161.54 |
| Injection Services (Pre-SW) | | | | $956,939.16 | 93.7% | $896,640.37 |
| Stelara (Post-SW) | 78 | 157 | 79 | $2,033,408.16 | 50.3% | $1,023,179.90 |
| **Total Medication Fraud Scheme** | **369** | **4,829** | **4,460** | **$13,022,327.63** | | **$11,134,913.14** |

This is a conservative estimate of the scope of the Defendants' medication injection scheme. The government assumed that the Defendants appropriately billed for the medications they actually purchased, even though the evidence shows they did not.

//

//

The Defendants' billing for injections of Cimzia prior to the execution of the search warrant exemplifies the egregiousness of their fraud. Cimzia is an anti-TNF (Tumor Necrosis Factor) agent, which functions the same way as other, cheaper Subject Medications, like Enbrel and Humira. The monthly dose for Cimzia is 400mg, which is often administered as two 200mg shots once per month or one 200mg shot every two weeks. During the relevant period, Cimzia was available for self-injection by patients or in-office injection in lyophilized form by a medical professional.

Claribel Tan regularly deceived patients by telling them they had to come into the office for monthly injections of Cimzia. Furthermore, patients who Claribel Tan claimed in medical records to have injected with two doses of Cimzia, totaling 400mg, told law enforcement during interviews that they only received one injection per visit. Based on the discrepancy between the amounts billed vs. purchased (see chart below), and recorded patient examinations, it is clear that Claribel Tan injected few, if any of her patients, with the correct dose of Cimzia between 2009 and July 2019. Instead, Claribel Tan regularly underdosed patients, injected them with free samples, or injected them with other substances without their knowledge or consent.

//

//

//

//

//

//



### i. The Recorded Medical Visits

In late 2018, two of Claribel Tan's longtime patients, B.L. and L.E., both Air Force veterans being treated for RA, agreed to record their medical appointments with Claribel Tan. Between 2012 and 2018, the Tans billed B.L.'s and L.E.'s insurance for two 200mg Cimzia injections on an approximately monthly basis even though neither patient recalled Claribel Tan giving them more than one injection per visit. In total, the Tans billed approximately $328,000 and $648,161 for Cimzia injections for B.L. and L.E., respectively, and received approximately $405,548.37 of reimbursements.

//

//

//

//

//

For each of B.L.'s five recorded appointments, which took place between October 2, 2018, and February 12, 2019, Claribel Tan's internal billing records falsely reflected two 200mg injections of Cimzia.[5] The recorded appointments reveal Claribel Tan actually injected B.L. with the following:

- October 2, 2018: one pre-filled syringe that appears to be a quarter dose of Enbrel

- November 8, 2018: one pre-filled syringe of Cimzia (pre-filled syringes are either medication for self-injection or a free sample)

- December 11, 2018: one pre-filled syringe that appears to be a quarter dose of Orencia

- January 15, 2019: one pre-filled syringe of Cimzia

- February 12, 2019: one generic syringe containing an unknown substance

For each of L.E.'s three recorded visits, which took place between October 15, 2018, and December 15, 2018, Claribel Tan billed L.E.'s insurance for two 200mg injections of Cimzia. The recorded examinations reveal Claribel Tan actually injected L.E. with the following:

- October 15, 2018: one pre-filled syringe of Cimzia

- November 15, 2018: one Simponi auto-injector

//

---

[5] The Tans submitted fraudulent claims to B.L.'s insurance for the first four recorded visits. The February 12, 2019, visit was billed to insurance after the July 9, 2019, search warrant and did not include medication charges.

- December 15, 2018: one pre-filled syringe that appears to be a half dose of Actemra

In other words, Claribel Tan not only underdosed both patients for each visit, but also injected them with different medications and/or unknown substances. Even if the generic syringe with which she injected B.L. on February 12, 2019, did contain Cimzia, the conditions observed during the search warrant, as described below, indicate Claribel Tan was incorrectly mixing, dosing, and/or storing generic syringes of Cimzia.

For each visit, Claribel Tan prepared handwritten and/or typed medical records falsely noting she gave B.L. and L.E. two 200mg injections of Cimzia. Daniel Tan then prepared a "Superbill" detailing the services claimed to have been provided, along with the related billing codes and reimbursement amounts. Daniel Tan provided these "superbills" to an independent contractor, M.K., who inputted the information into claims forms which were submitted to the pertinent insurers. In some instances, the Tans provided patients with the false medical records and/or sent false medical records to the patients' other healthcare providers and insurance companies. For example, Claribel Tan faxed typed medical records from L.E.'s December 15, 2018, examination to one of L.E.'s other medical providers, falsely stating that Claribel Tan injected 400mg of lyophilized Cimzia. After B.L. asked for a list of his medications during his January 15, 2019, examination, Claribel Tan provided him with the following handwritten note falsely stating that B.L. was receiving 400mg of Cimzia every four weeks:

//

//



The recorded examinations also exemplify some of the other deceptive conduct the Tans engaged in to carry out their fraud. For example, in each of the recorded examinations, Claribel Tan concealed the syringes from B.L. and L.E. by placing them under a clipboard and directing the patients to face away while she injected them. During L.E.'s October 15, 2018, recorded examination, when L.E. asked how her hopes of retiring and traveling the country by R.V. would impact her monthly injections, Claribel Tan did not inform her she could self-inject at home. Instead, both Daniel Tan and Claribel Tan intimated that L.E.'s only option would be switching to less effective and more expensive oral medications. Requiring patients to come to the office for injections was essential to the Defendants' scheme since they could not obtain reimbursement for medications injected at home.

//

The Tans repeated this pattern of deceitful conduct for nearly every patient who received in-office injections – failing to disclose or directly lying about the availability of self-injections, concealing syringes, consistently failing to provide complete medical records when requested, and/or providing falsified records. For example, Claribel Tan was unhappy with a patient, D.H., who switched rheumatologists and refused to provide D.H.'s medical records for the new rheumatologist. When D.H. later visited the clinic to obtain his medical records, Daniel Tan refused to provide them, was short with D.H., and refused to explain why he would not provide the records.

Claribel Tan's systematic underdosing of her patients not only failed to adequately treat those patients, but also denied them the opportunity to properly manage their conditions during critical years. Cimzia, like all biologics, takes weeks to become effective, and a half-dose of Cimzia only lasts for 12 days in the bloodstream. [Dkt. 99-1 at 10-11 ("Expert Report")] As a licensed rheumatologist with years of experience, Claribel Tan knew she was endangering her patients' health by underdosing them.

Claribel Tan's mixing of medications and/or unknown substances, as evidenced in the recorded examinations, further demonstrates her disregard for the safety and health of her patients. In her write-up of B.L.'s first recorded examination, for example, Claribel Tan noted that "Orencia is not preferred because it can increase blood glucose levels and worsen [B.L.'s] prediabetes." Nevertheless, two visits later Claribel Tan injected B.L. with Orencia even as she falsely documented in B.L.'s medical records that she was injecting B.L. with Cimzia.

//

Claribel Tan's injection of L.E. with Simponi on November 15, 2018, also illustrates her indifference to her patients' health. In August 2018, the Tans requested authorization to continue billing L.E.'s insurance for Cimzia. In the supporting medical records they submitted, Claribel Tan claimed that, since 2010, L.E. had had "inadequate response and persistent injection site reactions" to Simponi (and other less profitable medications). Claribel Tan claimed that "[a]fter being switched to Cimzia, [L.E.'s] disease activity [] responded significantly" and stated "[h]opefully, expensive joint replacement surgeries or hospitalizations can also be prevented in the future if Cimzia can be continued for the treatment of her rheumatoid arthritis." As noted by Dr. Carlin, Claribel Tan's intermittent injections of Cimzia, Humira, and Simponi would not only fail to treat RA, but could also lead to "anaphylactic reaction or neutralizing antibodies that can minimize the effectiveness of the drug[s]," potentially reducing the impact of future treatments, even if properly administered. [Expert Report at 11]

After L.E. turned 65, Claribel Tan stopped giving L.E. injections because the Tans did not accept Medicare. Instead, Claribel Tan began charging L.E. $70 per visit and giving L.E. whatever free samples or medicine were on hand at the clinic. After the first such visit, L.E. decided to see a new rheumatologist who informed L.E. that L.E. had osteoarthritis, not RA, and began weaning L.E. off RA medications altogether. B.L. also reported a significant improvement in morning stiffness and the frequency of flareups after switching rheumatologists and beginning to self-inject with the correct dose of Cimzia.

//

//

### i. July 9, 2019, Search Warrant

The government's search of the clinic uncovered stockpiles of expired medications, medications prescribed to patients for at-home use, free samples, and improperly stored syringes containing lyophilized Cimzia.

As an example, pictured below are expired medications that were intermingled with other medications stored in the clinic and two empty lyophilized Cimzia vials uncovered on Claribel Tan's desk, which had been expired for two years as of the date of the search warrant:





According to Dr. Carlin, using expired medications can lead to "drug instability, loss of effectiveness and contamination." [Expert Report at 12] Another rheumatologist, J.B., stated that expired Cimzia would probably be as effective as "sugar water." [Sealed Ex. 1 at 6] According to J.B., he would not provide an expired medicine to a patient, even if the patient knowingly requested it, since doing so is "essentially experimenting on patients." [*Id.*]

//

//

//

//

//

//

According to Dr. Carlin, limited amounts of free samples are generally provided to doctors to give to patients for self-injection while they seek authorization from their insurance. [Expert Report at 11] Some physicians may also give free samples to patients who cannot afford such medications. [*Id.*] In both cases, physicians may not bill insurance for free samples. However, as noted above, the Tans did not simply bill for free samples, which is healthcare fraud, they also repeatedly underdosed patients and falsified the patient records concerning the kinds and doses of drugs Claribel Tan injected into her patients.

Pictured below are some of the numerous free samples and medicines intended for at-home use found during the execution of the search warrant:

 

//

//

//

//

//

//

The free samples are clearly marked "Not for Sale:"



Federal law prohibits the transfer of certain drugs, including Cimzia, to any person other than the patient for whom the drugs are prescribed. Despite this, the Tans stockpiled excess medications, including expired ones, prescribed to patients for at-home use and paid for by insurance (and copays) so the Defendant could inject and bill for other patients. In some instances, the patients volunteered to donate their leftover medicines after Claribel Tan switched them to new medications. In others, Claribel Tan requested the patients bring in their excess medications.

//

//

//

//

Investigators also uncovered pre-filled generic syringes consistent with the syringe administered to B.L. on February 12, 2019. One box, pictured below, contained 31 such syringes, 4 of which were tested by the FDA and determined to contain some amount of lyophilized Cimzia. According to the FDA, lyophilized Cimzia needs to be utilized within twenty-four hours of mixing – something Claribel Tan would not have been able to do based on the dozens of pre-filled syringes contained in the box.

 

### ii. Continued Fraud Post-Search Warrant

In the immediate aftermath of the search warrant, the Tans appeared to temporarily begin purchasing more drugs. On July 29, 2019, for example, the Tans purchased their first ever dose of Stelara after having previously billed for 130 units of Stelara. In 2020 and 2021, the Tans appeared to purchase the same amount of Stelara as they billed to insurance. Around the same time, Daniel Tan also directed the Tans' biller, M.K., to remove certain

drug reimbursement requests from claims forms that had not yet been submitted. This resulted in M.K. submitting a claims form for B.L.'s February 12, 2019, visit that did not request reimbursement for Cimzia or injection services even though Daniel Tan's superbill for the appointment stated B.L. had received 400mg of Cimzia and related injection services. Daniel Tan explained this sudden change in billing practices to M.K. by claiming he "made a mistake" and "should not have been billing insurance for [one of the drugs]."

The Tans' temporary change in behavior did not last, and, by 2021, they were again committing fraud. Between 2021 and March 19, 2024, the Tans billed 103 units of Stelara but only purchased 24 units. The Tans' history of billing for and purchasing Stelara after the search warrant is depicted below:



//

//

Beginning around 2018, and continuing after the search warrant, the Tans began to increase their billings for Stelara. Their billing records also show a corresponding decrease in Cimzia billings around that time. *See* charts below.



Some patients reported that, around this time, Claribel Tan recommended they switch from Cimzia to Stelara. During B.L.'s final recorded examination on February 12,

2019, for example, Claribel Tan recommended that B.L switch from Cimzia to Stelara. This was curious, since B.L. has RA, and Stelara is *not* an FDA-approved treatment for RA, has not been shown to be an effective treatment for RA, and is not used off label to treat RA. [Expert Report at 6] Cimzia, by contrast, is approved for RA. [*Id.* at 3]

Such a clinic-wide shift in treatment makes sense, however, if the primary motive was greed. From a fraudulent billing perspective, Stelara has several advantages. It requires fewer injections but is reimbursed at a much higher rate than Cimzia, and it is easier to conceal, since the correct dose is generally one syringe instead of two. The Tans received an average reimbursement of $12,121 per unit of Stelara and only $3,877 per unit of Cimzia.

Other patients also reported Claribel Tan switched them from monthly Cimzia injections to quarterly in-office Stelara injections. One such patient, L.L., told investigators that, in June 2018, Claribel Tan switched him from self-injections of Cimzia to in-office injections of Stelara because "Cimzia was not helping his back and shoulder pain." According to L.L., the way Claribel Tan prepared Stelara injections changed over time. Initially, she prepared the syringes outside the examination room. After July 2019, she began preparing the syringes inside the examination room. L.L. stated the syringes prepared inside the examination room caused a "burning sensation" that "hurt like a mother," unlike those prepared outside the examination room, which "hurt a lot less" or not at all. When L.L. asked Claribel Tan why the injections hurt more, she told him she had diluted them in the beginning, but did not explain why.

//

### B. The Prolonged Services Scheme

The Tans also fraudulently billed for "prolonged services" that their patients did not receive. Physicians are permitted to bill for additional face-to-face time with patients above a specific threshold, generally 70 minutes (billed using code "99354") and 115 minutes (code "99355"). Between 2010 and July 8, 2019, the Tans fraudulently billed health benefit programs for more than $1.3 million of prolonged services, as detailed in the following table:

| Drug/Service Name | Units Claimed | Total Reimbursements | Fraud Ratio | Fraud Proceeds |
|---|---|---|---|---|
| Prolong Services 1st Hour | 3,918 | 933,206.50 | 100.0% | 933,206.50 |
| Prolong Services Addt. 30 Min. | 1,752 | 453,631.79 | 100.0% | 453,631.79 |
| Total Prolonged Services Fraud Scheme | | | | 1,386,838.29 |

The government interviewed more than 40 of Claribel Tan's patients, each of whom stated they never spent more than an hour of face-to-face time with Claribel Tan, except potentially when receiving the first dose of a new medication. Most of those patients reported spending less than 30 minutes per visit. Even if Claribel Tan were spending the claimed amounts of time with her patients, she had no medical justification for doing so. Post-injection monitoring was already covered by the injection codes the Tans billed for each injection Claribel Tan purportedly provided. [Expert Report at 8].

The Tans also frequently combined the prolonged services codes with service codes (99214 and 99215) used for level 4 or 5 visits. [*Id.*] Level 5 visits are appropriate for a severely ill patients with unstable medical problems requiring complex decision making by the physician. [*Id.*] By contrast, the Tans used these billing codes for regular in-office injections that in most cases could have been performed by the patient at home. In more

than three decades of practice, Dr. Carlin has "never billed for more [time] than a 99215 visit, even in extenuating circumstance[s] where [he] was coordinating a hospitalization of a complicated patient." [*Id.*] The Government conservatively estimated the loss amount for the Tans' prolonged services scheme by excluding the reimbursements for the Tans' 99215 claims, even though, in most cases, there was no justification for those claims.

The findings of a 2016 TRICARE audit of the clinic further illustrate the Tans' fraudulent prolonged services claims. The audit compared Claribel Tan's billing practices between April 1, 2013, and January 14, 2016, with those of a peer Alaska-based rheumatologist. The audit found that the Tans billed for prolonged services codes approximately 400 times compared with the peer rheumatologist who never billed for prolonged services; the Tans' average reimbursement claims for office visits were 740% higher than the peer's (*see* Figure 4, below); and the Tans billed 378% more time on average for office visits for 11 patients who were subsequently treated by the peer rheumatologist (*see* Figure 6 below).



Figure 4



Figure 6

//

On April 22, 2016, TRICARE requested medical records from the clinic to substantiate the Tans' prolonged services claims. In response, the Tans immediately scaled back their billing of prolonged services, from $529,016, in 2015, to $45,478, in 2016 – with the majority of the 2016 prolonged services claims occurring before the document request. The Tans also created fraudulent medical records to conceal their fraud scheme. For example, the Tans created medical records for three patients dated September 27, 2012, in which they claimed Claribel Tan spent more than 115 minutes of face-to-face time with each patient for an impossible combined total of almost six hours of face-to-face time between 8:35am and 11:53am. In fact, over the course of that day, the Tans billed prolonged services for 11 of the 13 patients that visited the clinic, which would have required a minimum of 20.75 hours of face-to-face time. The Tans repeatedly billed for prolonged services that required more hours of face-to-face patient time than they could have reasonably provided in a day.

### C. Tax Fraud

The Tans also committed tax fraud to further enrich themselves and help conceal their healthcare fraud scheme. In late 2016, after receiving multiple notices from the IRS regarding their failure to file personal or corporate tax returns for 2011-2015, the Tans hired a tax return preparer. For tax years 2013 through 2017, Daniel Tan willfully provided the return preparer with spreadsheets that, among other things, fraudulently overstated the total amount of medications the Tans purchased, whereas both Defendants were aware the value of the medications they purchased was substantially less than what they reported to the IRS. The return preparer relied on the fraudulent information they provided to prepare

the Tans' 2014, 2015, and 2017 corporate and individual tax returns. In 2019, after learning

the Tans were under federal investigation, but prior to completing their 2013 and 2016 tax

returns, the return preparer fired the Tans as clients.

Claribel Tan willfully signed and submitted corporate tax returns for 2014, 2015,

and 2017 that fraudulently overstated the clinic's cost of goods sold (i.e. medications

purchased) and thereby understated its income. Both Claribel and Daniel Tan willfully

signed and filed 2014, 2015, and 2017 joint individual tax returns that fraudulently

understated their taxable income. The following chart shows the Tans' reported costs of

goods sold vs. their actual costs of good sold:

| Year | Reported | Per bank records | Per medication suppliers |
|---|---|---|---|
| 2013 | $1,509,375.80 | $141,783.77 | $56,328.17 |
| 2014 | $1,040,536.00 | $94,053.31 | $35,804.98 |
| 2015 | $1,986,331.00 | $242,806.45 | $182,272.63 |
| 2016 | $2,300,431.27 | $169,199.48 | $145,990.32 |
| 2017 | $1,572,610.00 | $238,014.97 | $199,294.50 |
| **TOTAL** | **$8,409,284.07** | **$885,857.98** | **$619,690.60** |

The Tans' filing of false tax returns served two purposes. First, it allowed them to

further conceal their healthcare fraud scheme. Second, it allowed them to keep more of the

proceeds from the scheme. The total tax loss from the Tans' evasion of taxes for 2013-

2017, and their willful failure to file tax returns for 2018-2021, is $4,249,509.

| Tax Year | Tax Loss |
|---|---|
| 2013 | $624,753 |
| 2014 | $389,659 |
| 2015 | $715,087 |
| 2016 | $654,231 |
| 2017 | $487,064 |
| 2018 | $812,038 |
| 2019 | $446,220 |
| 2020 | $140,472 |

| Tax Year | Tax Loss |
|---|---|
| 2021 | ($21,015)[6] |
| **TOTAL** | **$4,249,509** |

## IV. STATUTORY CRITERIA AND RECOMMENDED SENTENCE

### 1. Nature and circumstances of the offense

The nature and circumstances of the Defendant's conduct strongly support the government's proposed sentence.

#### A. Scope and Duration

The Defendants engaged in a 15-year-long, $12 million fraud scheme that permeated almost every area of their practice. Between 2010 and 2024, the Defendants purchased less than 8% of the Subject Medications they billed to insurance. They created fraudulent medical records, filed false tax returns, deceived patients, and endangered the health of their patients.

Even after learning they were under investigation, the Defendants continued to lie and steal. For example, after the Defendants learned of the TRICARE audit in 2016, they largely stopped fraudulently billing for prolonged services but continued to execute the medication injection scheme. After the 2019 search warrant, the Defendants appeared to temporarily pause the medication injection scheme only to later resume their scheme once they felt the heat had died down. And even after Claribel Tan was indicted and her medical license suspended, one patient, D.W., told investigators that Claribel Tan called and told D.W. "everything is half-price" if D.W. were willing to come back. A significant

---

[6] Based on the Tans unreported income and the investigation's analysis of their expenses, the Tans would have been entitled to a $21,015 refund if they had reported and paid taxes.

prison sentence is needed to account for the length and brazen nature of Claribel Tan's criminal conduct, the millions of dollars she stole, and the hundreds of patients she endangered.

## B. Deceit

The Defendants' fraud scheme did not just involve lying to insurance companies and the government on claim forms and tax returns. Claribel Tan lied to patients over and over about the need for them to receive injections in the office and about the doses and kinds of medications that she was injecting into them. She lied in hundreds of patient encounters and in thousands of medical records. In doing so, she denied those patients the ability to manage their conditions and obtain the treatment to which they were entitled. The scale of her deceit calls for a significant prison sentence.

## C. Patient Impact

Claribel Tan's patients came to her seeking treatment for serious and debilitating diseases. As a doctor, Claribel Tan had a duty of care to those patients – they relied on her and trusted her to take care of them. Instead, she betrayed their trust and provided them with substandard care that, by her own admission, consciously and recklessly risked causing a serious bodily injury.

//

//

//

//

//

RA and the other autoimmune conditions Claribel Tan treated are lifelong progressive diseases. There is no cure. The government expects that Dr. Carlin will explain at the sentencing hearings that these conditions can result in severe physical deformities, pain, fatigue, and cardiovascular disease if left untreated. [Expert Report at 7] RA can progress rapidly, with disability often occurring within two years of disease onset. *See below*, early RA, progressive RA, and late-stage RA (pictured from left to right in descending order).






Modern treatments, including the Subject Medications, can arrest the development of theses diseases but cannot reverse their impacts – which is why it is so important to treat them early and aggressively. Nevertheless, these treatments carry serious side-effects. As an example, methotrexate, a "first line" RA treatment frequently prescribed by the Defendant, which is often used in conjunction with the Subject Medications, can lead to hair loss, GI-issues, mouth sores, increased risk of infections, and other complications. By underdosing and switching patients' injections, Claribel Tan exposed them to the potential side effects of these medications without the corresponding benefits. [Expert Report at 13] By doing so she may also have induced resistance in certain patients to future treatment that otherwise might have been effective. [*Id.* at 11]

The Defendants did not just defraud healthcare benefit programs through their scheme. They financially exploited their patients by charging them copays and fees for unnecessary in-office injections, examinations, and other medications. And when some of those patients switched to Medicare, the Tans either stopped treating them or had them pay out of pocket for office visits and whatever medication the Tans had on hand.

On a psychological level, the impact of Claribel Tan's conduct cannot be understated. Many patients spent years being treated for chronic conditions with little to no improvement, constantly switching medications and treatment plans, and taking time off work to be injected for no medical reason. The victim impact statements highlight the devastating sense of betrayal and uncertainty many of the patients felt at learning about her conduct. They also highlight the humiliation of not being able to perform basic tasks due to unmanaged pain; the loss of quality time with loved ones; the frustration of being

betrayed by one's own body; and the displacement of ambitions and dreams by chronic disease. Heartbreakingly, some of the patients appear to feel responsible for how Claribel Tan deceived and exploited them, as evidenced by L.E.'s statement to Alaska Medical Board investigators that her "biggest regret is that I didn't advocate for myself."

As if that were not bad enough, due to the Tans' efforts to conceal their scheme, many of Claribel Tan's patients do not have accurate medical records for years of treatment. The false records that she created will negatively affect the ability of other providers to treat her former patients. Those other providers will not know those patients' true medical and treatment history, which therapies worked, which therapies did not, and whether any particular patient suffered from adverse reactions to various treatments. Without accurate medical records, the patients are likely left without a continuity of care that many of them desperately need. A Guideline sentence is therefore necessary to account for the nature and circumstances of the Defendant's crimes.

## 2. Defendant's history and characteristics

The Defendant comes before the Court without mitigating circumstances in her history that can provide an explanation for her criminal conduct other than pure greed. The Defendant is highly educated. She did not need to commit fraud and endanger her patients to accumulate wealth. She did not steal because of a gambling or drug addiction. These facts all call for a significant prison sentence.

This is not a case where the Tans used their ill-gotten gains to purchase fancy cars and houses. Still, the only plausible motivation for their crimes is greed. The Tans saved and invested the proceeds of their scheme and accumulated vast wealth. Even

after forfeiting more than $10.4 million, paying more than $6.3 million towards restitution at sentencing, and paying more than $1.8 million to settle civil claims under the False Claims Act, according to the Tans' financial disclosures they will still have millions of dollars left over. The Tans' agreement to pay financial penalties in connection with their sentence is a mitigating factor that contributed to the government's agreement to recommend variance for both Defendants equivalent to a two-level departure.

Finally, although a downward departure may be permissible in cases where a defendant is an "irreplaceable caretaker of . . . [a] seriously ill family member, and the extent of the departure appropriately serves to protect those family members from the impacts of the defendant's prolonged incarceration," such extraordinary circumstances do not exist here. *United States v. Leon*, 341 F.3d 928, 931 (9th Cir. 2003). Daniel Tan is a defendant, *not* an innocent family member. There is no evidence that BOP will be unable to accommodate his medical needs. The Defendants also own sufficient assets, even after accounting for their restitution obligations, which they can use to hire care should Daniel Tan be released prior to Claribel Tan. *See United States v. Young*, 105 Fed.Appx.926, 927-28 (9th Cir. 2004) (finding downward departure was abuse of discretion even though district court identified obstacles to "provision of care, or hiring of care," for the defendant's mother).

//

//

//

### 3. Seriousness of the offense and just punishments

Upon becoming a doctor, every individual swears to uphold some version of the following covenant:

> . . . I will apply, for the benefit of the sick, all measures [that] are required, avoiding those twin traps of overtreatment and therapeutic nihilism. . . .
>
> I will remember that I do not treat a fever chart, a cancerous growth, but a sick human being, whose illness may affect the person's family and economic stability. My responsibility includes these related problems, if I am to care adequately for the sick. . . .
>
> I will remember that I remain a member of society, with special obligations to all my fellow human beings, those sound of mind and body as well as the infirm. . . .
>
> May I always act so as to preserve the finest traditions of my calling and may I long experience the joy of healing those who seek my help.[7]

Claribel Tan abused her position to exploit hundreds of patients who came to her seeking relief from chronic diseases and who trusted her with their bodies, their money, and their time. She violated the core tenets of her profession by injecting patients without informed consent, denying them proper care, and viewing them, not even as a "fever chart [or] a cancerous growth," but as a vehicle for her own enrichment. The government's recommended sentence is necessary to reflect the seriousness of this betrayal.

On a macro level, fraud and malpractice by medical professionals undermines confidence in the entire medical system, which can worsen health outcomes and reduce

---

[7] Hippocratic Oath, Louis Lasagna (1964), accessed March 11, 2016, at https://www.pbs.org/wgbh/nova/doctors/oath_modern.html.

access to real care.  A strong sentence is needed to send the message that healthcare fraud is a serious offense and promote accountability in the industry.

### 4. Deterrence

One of the primary factors that the Court must consider in imposing a sentence is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B).

### A. General Deterrence

White collar criminals are "prime candidates for general deterrence" because they "act rationally, calculating and comparing the risks and the rewards before deciding whether to engage in criminal activity." *United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018) (citation omitted); *see also* Joshua D. Blank, *In Defense of Individual Tax Privacy*, 61 Emory L.J. 265, 321 (2011) ("Studies have shown that salient examples of tax-enforcement actions against specific taxpayers, especially those that involve criminal sanctions, have a significant and positive deterrent effect.").

General deterrence is also vitally important in both healthcare and tax fraud cases because it is essential to reducing the hundreds of billions of dollars that are lost annually through fraud. The latest IRS study of tax compliance estimates that only 85% of individuals are compliant with their tax obligations, leaving a yearly tax gap of over $696 billion dollars in unreported and uncollected taxes.[8]  In 2022 and 2023, the United States

---

[8] "Tax Gap Projections for Tax Year 2022," October 2024, available at https://www.irs.gov/pub/irs-pdf/p5869.pdf.

spent $4.5 trillion and $4.9 trillion, respectively, on healthcare.[9] Even assuming a conservative 3% fraud rate, the amount of money lost annually to healthcare fraud is staggering.[10] This cost is passed on to consumers in the form of higher premiums and out-of-pocket expenses, increased red tape, and reduced access to treatment.

Unfortunately, the rate of prosecution pales in comparison to the societal and individual cost of healthcare and tax fraud, due largely to the complexity and resource-intensiveness of such cases. Between FY 2020 and FY 2024, for example, approximately 1,939 individuals were sentenced for healthcare fraud.[11] Put differently, of the 61,678 cases reported to the U.S. Sentencing Commission in FY 2024, only 395 involved healthcare fraud. *Id.* The median fraud loss was approximately $2.5 million, with only 20% of all cases involving a fraud loss greater than $9.5 million. *Id.* A meaningful Guideline sentence is therefore necessary to deter fraudsters who might otherwise think the benefits of engaging in healthcare or tax fraud outweigh the risk. *See United States v. Kuhlman*, 711 F.3d 1321, 1328 (11th Cir. 2013) ("Insurance companies must rely on the honesty and integrity of medical practitioners in making diagnoses and billing for their services. . . . deterrence is an important factor in the sentencing calculus because healthcare fraud is so rampant that the government lacks the resources to reach it all.")

---

[9] "What Data Says About Health Care Fraud," Colin May, Association of Certified Fraud Examiners, April 2025, available at https://www.acfe.com/acfe-insights-blog/blog-detail?s=what-data-says-about-health-care-fraud.

[10] "The Challenge of Health Care Fraud," National Health Care Anti-Fraud Association, accessed March 11, 2026, at https://www.nhcaa.org/tools-insights/about-health-care-fraud/the-challenge-of-health-care-fraud/.

[11] "Health Care Fraud," United States Sentencing Commission, accessed March 11, 2026, at https://www.ussc.gov/research/quick-facts/health-care-fraud.

**B. Specific Deterrence**

The Defendant's surrender of her medical license (following her summary suspension by the Alaska Medical Board) means she is unlikely to commit healthcare fraud in the future. However, it is worth noting that the Defendant was not deterred from continuing to commit fraud after learning of the TRICARE audit and the criminal investigation. The Court's sentence should be sufficient to deter the Defendant from further crimes even if she will likely not be able to engage in healthcare fraud in the future.

**5. Avoidance of unwarranted disparities**

The government's recommended sentence of 78-months imprisonment would not result in unwarranted sentencing disparities. Notably, according to the JSIN data the government's recommended sentence equals the median length of imprisonment for Defendants convicted of healthcare fraud who had the same offense level and criminal history as Claribel Tan. [PSR at 3] The government has found the following fraud cases in which the Defendants were sentenced to range of sentences below and above the government's recommended sentence:

- *United States v. Crispin Abarientos*, No. 19-cr-171 (D. Conn.) (rheumatologist convicted of billing Medicaid for infusion drugs he never purchased, sentenced to Guideline 37 months imprisonment and ordered to pay $894,789 in restitution);

- *United States v. Alice Chu*, No. 19-cr-678 (D.N.J.) (rheumatologist convicted of billing healthcare benefit programs for infusion drugs she

never purchased, sentenced to 21 months imprisonment and ordered to pay $3,668,997.43 in restitution);

- *United States v. Mark Kuper*, No. 20-cr-156 (N.D.TX.) (doctor who owned and operated two clinics focusing on orthopedic and spinal disorders and who conspired to submit more than $10 million of fraudulent claims to federal healthcare programs sentenced to Guideline 120 months and ordered to pay $4,209,890 in restitution);

- *United States v. Thomas Whitten*, No. 20-cr-18-WSS (W.D.PA.) (pain management physician who engaged in four-year scheme to prescribe controlled substances in exchange for kickbacks and to submit fraudulent claims to federal healthcare programs sentenced to Guideline 57 months incarceration and ordered to pay $8,500,085 of restitution); and

- *United States v. Doretha Selby-Diggs*, No. 14-cr-137-RBS-TEM (E.D.VA.) (defendant who conspired with others defraud by Medicaid by submitting 3,907 fraudulent mental health service sentenced to Guideline 60 months and ordered to pay $286,650 in restitution).

//

//

//

//

//

//

## V.  RESTITUTION

The parties have agreed to the restitution that the Defendants owe to the healthcare benefit plan victims. [Sealed Ex. 2] Patient victims have submitted the following requests for restitution:

- B.L.: $1,356 for co-pays [Dkt. 106-1 at 25];

- L.C.: $1,000 for counseling [Dkt. 106-1 at 39];

- D.W.: $836,151.12 for lost wages for self and spouse, and out-of-pocket medical expenses [Dkt. 106-2 at 12]; and

- D.A.: $110,997 for out-of-pocket medical expenses and lost wages [Dkt. 106-3.1 at 7];[12]

- S.V.: $7,500 for travel costs for attending unnecessary and fraudulent appointments [To be filed in advance of the sentencing hearing].

## VI.  FORFEITURE

The Defendants have agreed to forfeit the assets listed in their plea agreements, which include approximately $7,050,042.23 seized from Northrim Bank, and approximately $3,421,064.20 seized from Vanguard Group, Inc., all of which constitute direct and indirect proceeds of healthcare fraud.

//

//

//

//

---

[12] D.A. also requests $500,000 in punitive damages. D.A. reports that they received infusions from Claribel Tan. The government did not investigate fraud in the infusion part of the clinic.

## VII. CONCLUSION

Based on the foregoing, a 78-month custodial sentence followed by two years of supervised release is both necessary and appropriate. Restitution should also be ordered in the total amount of not less than $16,771,260. The Court should further order the Defendants to forfeit the assets listed in their plea agreements.

RESPECTFULLY SUBMITTED March 13, 2026 at Anchorage, Alaska

MICHAEL J. HEYMAN
United States Attorney

 s/ *Dominick D. Giovanniello*
DOMINICK D. GIOVANNIELLO
Trial Attorney

s/ *Seth M. Beausang*
SETH M. BEAUSANG
Assistant United States Attorney
United States of America

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 13, 2026 a true and correct copy of the foregoing was served electronically on all counsel of record.

s/ *Seth M. Beausang*